Argued January 20; affirmed February 9, 1937

# R. E. DAVIS ELECTRIC CO., Inc., *v.*
# HOPKINS ET AL.
### (64 P. (2d) 1317)

Department 2.

*G. E. Hamaker*, of Portland, for appellant.
*C. O. Fenlason*, of Portland, for respondent.

CAMPBELL, J. On September 24, 1935, plaintiff filed its second amended complaint alleging that defendants were engaged as joint adventurers in certain logging operations in Skamania county, Washington; that said operations were conducted under the name of Hopkins & Clay; that on or about December 1, 1933 said defendants entered into a contract with plaintiff the pertinent parts of which are as follows:

"That the parties of the second part (plaintiff herein) are to furnish two 40 hp Double Drum Gasoline Driven logging hoists, and one Double Drum 100 hp Gasoline Driven Hoist, together with all necessary cables, blocks, sheaves, and chokers, for the logging of approximately one million board feet of logs, near

Hamilton Mountain, in the State of Washington. The parties of the second part are to transport the above mentioned hoists and equipment to and from this location near Hamilton Mountain; furnish all gasoline and oil required for their operation, together with three men who will be the logging hoist operators for the logging of approximately one million board feet of logs. The loading on trucks is to be done by the trucking men from a loading platform, to which we pull these logs. For this mentioned work, the parties of the first part are to pay the parties of the second part, the sum of four dollars and twenty-five cents ($4.25) per thousand board feet, if an average of twenty thousand board feet per eight-hour day can be logged; $4.00 per thousand board feet if an average of thirty thousand board feet per eight-hour day can be logged, and $3.75 per thousand board feet per eight-hour day if an average of forty thousand board feet can be logged. These averages to be based on weekly runs of actual operating days, after the machinery and equipment is set up, ready to run. And if over forty thousand board feet per eight hour day can be logged, a decrease of price will be paid in proportion to the above mentioned figures. The parties of the second part agree to log a minimum average of fifteen thousand board feet per day, based on weekly averages, after the machinery is set up, with all necessary help furnished by the parties of the first part, in connection with this setting up, except the three hoist engineers mentioned above. It is also agreed that at least seven hundred fifty thousand board feet of logs are to be furnished at this location, and the payment of this logging to the parties of the second part is to be made when the parties of the first part receive their payment for these logs, and in any event, not later than thirty (30) days from time of shipment of each raft; otherwise this contract can be cancelled at the option of the parties of the second part, and all their expenses for transportation, placing of equipment, and a reasonable rental of the equipment will be paid by the parties of the first part. * * * All

labor in connection with the setting of the cables, chokers, blocks, and moving hoists, to be furnished by the parties of the first part, except the climbing of trees, known as spar trees, for the fastening of high lead blocks and cables; this climbing is to be done by men furnished by the parties of the second part. All loading platforms and swamping roads or any other class of work other than the operation of the hoists, to be supplied by the parties of the first part. It is also agreed that the parties of the first part are to buck and fall sufficient trees cut into logs, to be ready for logging, to the extent of a minimum average of fifteen thousand board feet per day, averaged weekly.

All moneys received from the logs or piling logged from the above mentioned location, will be immediately turned over to Mr. Perry Abbott and disbursed by him immediately upon the receipt of the proceeds from each raft.''

Plaintiff alleges that it fulfilled its part of the contract in that all the crew, equipment and machinery agreed to be furnished by it under the contract was set up and on the premises ready for operation on January 31, 1934. (The date here alleged is in all probability a typographical error, as the original complaint and the first amended complaint allege the date of January 1, 1934, and the testimony was received without objection that all the machinery and equipment were set up ready for operation between December 15 and 20, 1933.)

It further alleges it maintained such equipment and machinery on the premises from the date above alleged until March 28, 1934, a period of 78 working days; that defendant failed to furnish a sufficient quantity of logs or to maintain a sufficient crew to carry on the logging successfully and keep the machinery and equipment in operation. On this cause of action it alleges that it logged 250,000 board feet of timber; that the

said timber was made into rafts and more than 30 days have elapsed since the sale thereof; that defendant furnished less than a minimum of 20,000 board feet of logs per day, and that the rate was $4.25 per thousand board feet, amounting to $1,062.50 for which it demands judgment.

For its second cause of action, it realleges the formal parts of the complaint and the execution and the formal parts of the contract and the breach of it by defendant, alleging that it provided sufficient machinery, equipment and crew to have logged the balance of the 750,000 board feet minimum to be logged in the contract, and that by reason of defendant's failure to supply the minimum amount of logs specified in the contract to keep the machinery and equipment operating steadily it was damaged in the sum of $2,125.

Defendants Clay and Hopkins filed an answer admitting that they entered into the contract alleged in the plaintiff's complaint, but that plaintiff failed to carry out its part of the contract in that the machinery and equipment furnished by plaintiff for the purpose for which it was required was wornout, delapitated and worthless, and alleged that they were damaged by reason of plaintiff's failure to perform.

Defendants Perry L. Abbott and the Abbott Company, Inc., a corporation filed an answer consisting of a general denial.

The case came on for trial and, at the close of plaintiff's case in chief, defendant Abbott and the Abbott Company, Inc., each moved for an involuntary nonsuit on the ground that there was no evidence tending to prove that either of those defendants were joint adventurers in the business with the other defendants. These motions were denied and exceptions saved.

At the close of all the testimony, defendant Perry L. Abbott requested the court to instruct the jury to return a verdict in favor of defendant Perry L. Abbott, which request was refused. A similar instruction was requested and given in behalf of the Abbott Company, Inc., and a verdict so returned and judgment entered thereon.

The case was then submitted to the jury who returned a verdict in favor of plaintiff on its first cause of action in the sum of $1,062.50, and on its second cause of action in the sum of $2,025 against defendants Hopkins and Clay and Abbott, and judgment entered thereon. Defendant Abbott appeals.

The bill of exceptions presents several alleged errors, but the real questions in this case are: First: Is there any evidence to support a verdict against Perry L. Abbott? Second: Did the court correctly instruct the jury as to the measure of damages?

Perry L. Abbott strongly contends that he was not a joint adventurer with Hopkins & Clay and that there is no evidence to support such an allegation.

Mr. Davis, manager of plaintiff, testified:

"A. They (Hopkins and Clay) told me they wanted it for logging logs or timber and I am not sure they gave me the location at that time or not. I was not interested. We simply rent to any one. They were given the prices and they told me they would let me know. Several days later, they said they didn't have the money to rent but wanted some one with equipment to furnish the equipment and log the timber down an incline at so much per thousand board feet and I told them while I don't make a business of that, that I would rent the donkeys and I would undertake the job after looking it over. I asked where the money was coming from. They said they had a silent partner. I told them I wouldn't enter into a

contract unless I knew where the money was coming from. Mr. Clay told me at that time that it was Mr. Abbott.''

■ This testimony was objected to by defendant Abbott. The court overruled the objection with the instruction to the jury that it would not be binding on the defendant Abbott. It was not error to receive this testimony for the purpose for which it was intended: Jones Commentary on Evidence, Vol. 2, § 251, p. 424.

Mr. Davis further testified that, after receiving that information and before entering into the contract, he called Mr. Abbott on the telephone and the following conversation took place:

"I immediately called Perry Abbott and asked him that fact. He told me he was and he had furnished the money to buy the timber and he was borrowing the money to buy the equipment but he didn't have the money to rent the donkeys at that time.

\*　　\*　　\*　　\*　　\*

He informed me he was furnishing the money for this logging operation. He said, 'We may not make anything out of this but we have several other big logging deals and if this can only pay its way, we will go into something larger.' He said, 'I have known you Davis, for several years and anything you furnish will be satisfactory.'

\*　　\*　　\*　　\*　　\*

In our conversation with Mr. Abbott, the main point was that if this proposition paid, he was going into something larger and that Hopkins & Clay were to give him a report every week of all the doings of this logging business and all the moneys would come to him and he would disburse this money and he said, 'Davis, I will see you don't lose a cent by it.' That is the main thing that made me go ahead with this logging contract with Hopkins, Clay and Abbott.''

While Mr. Hopkins was on the witness stand, he produced an agreement between Hopkins, Clay and Abbott. This agreement provided for an advance of $400 by defendant Abbott to Hopkins and Clay which was to be repaid out of the moneys received from the adventure. This agreement provided that when all the expenses of the venture should be paid and the advancement of $400 should be repaid, the net profits were to be divided 75 per cent to Hopkins and Clay and 25 per cent to Abbott. This contract covered all the "timber products" manufactured from the timber logged under the contract with plaintiff. Mr. Abbott testified that this later contract only related to cordwood and was abrogated the day it was made and was never in effect. He said it was cancelled the day it was made on the advice of his attorney. However, later he called his attorney as a witness but did not ask the attorney whether he had ever given such advice.

There was other testimony tending to support the allegations of the complaint in respect to the joint adventure, such as showing that defendant Abbott on occasion bought supplies and assumed responsibility for the payments of the loggers' wages and exercised some control over the operation of the venture.

■ Defendant Hopkins testified that no partnership existed between Hopkins & Clay and the Abbott Company, Inc., or Perry L. Abbott. Perry L. Abbott testified that he never had entered into any partnership agreement or any arrangement on the logging contract to divide the profits with Hopkins & Clay. It was a question of fact for the jury to determine whether there was any liability on the part of Perry L. Abbott as a joint adventurer, and the jury found adversely to Mr.

Abbott's contention. There is no criticism on the part of appellant of the court's instructions to the jury as to what constituted a joint adventure.

Plaintiff introduced evidence tending to prove that the machinery and equipment that he furnished on the job was all in first-class condition and sufficient to carry on the operation expeditiously. Plaintiff maintained its equipment and crew on the premises for a sufficient length of time to have more than logged the minimum number of board feet called for in the contract, if the defendants had furnished the logs at the daily minimum rate agreed upon.

■ Generally speaking, the measure of damages for breach of contract is the difference between the contract price and the cost of doing the work: *Pacific Bridge Company v. Oregon Hassam Company,* 67 Or. 576 (134 P. 1184); *Savage v. Glenn,* 10 Or. 440. But where the contractor has incurred all the expense of performing the entire contract, and has done all the things on his part to be performed, and is prevented from complete performance by the default of the other party, then, in the absence of special damages, the measure of damages would be the contract price: Sedgwick on Damages, (9th Ed.) Vol. 2, § 612a.

In *Wood v. Schettler,* 23 Wisc. 501, the court clearly and concisely stated the law as follows:

"It appears from the evidence, that by the contract the plaintiffs were to press and bale a quantity of hay for the defendant at $3.50 per ton, the defendant to furnish the hoops for securing the bales. They only baled some twenty-three tons. It appeared, however, that the plaintiffs removed their press, which weighed about six tons, on to the defendant's farm, and remained with it there ready for work long enough to have baled more than a hundred tons. Their

men were with them, and they were at the same expense they would have been had they been at work all the time. The reason why they did not or could not complete their contract was, that the defendant failed to furnish suitable hoops in the requisite quantity. But still the plaintiffs would have incurred no further expense had they been at work all the time. They had to board their men, and pay their wages, for the full time it would have taken them to press and bale all the hay they undertook to bale on the contract. And they would have fully performed the contract while waiting for the hoops, had they not been prevented from work on that acocunt. If they were idle, it was through the default of the defendant, and it cost them the same to be idle it would to work. Under the circumstances, we think it is clear that the measure of damages was the price agreed to be paid for pressing and bailing the hay. That was only a just recompense for the actual injury they sustained by the failure of the defendant to provide the hoops. To say that they were only entitled to recover the difference between the contract price and what it would have cost them to complete the remainder of the work agreed upon, when they had already incurred all the expense necessary for performing the contract, is obviously unjust. The counsel for the defendant say that where there is a contract for services, and no further expense would be incurred in completing the contract than in doing nothing, then, if the employee is obliged to be still and do nothing, his loss is just what he could have made—the contract price."

"In some cases, the plaintiff may recover the whole contract price. * * * If, in such a case, the plaintiff is put to the same expense in time and money as if he had fully performed, the contract price of the whole work is the measure of damages." Sedgwick on Damages, (9th Ed.) Vol. 2, § 612a.

■ In the instant case the court instructed the jury in regard to the measure of damages as follows:

"As to plaintiff's second cause of action, if you find by a preponderance of the evidence that the plain-

tiff maintained its equipment and sufficient men to operate the same for a sufficient period of time to have logged 750,000 board feet of logs at the rate of 15,000 board feet per day, averaged weekly, provided that the joint adventurers had fully performed their part of the agreement, the plaintiff is entitled to recover of the joint adventurers the difference between 750,000 board feet and the number of thousand feet which you find were logged at the rate of $4.25 per thousand.''

This is a correct expression of the law as applied to the facts herein, and the complaint alleges facts which clearly bring it within the rule announced and states a cause of action.

■ The court, in instructing the jury to return a verdict in favor of the Abbott Company, Inc., miscalled the name of said corporation by referring to it as the ''Perry L. Abbott Company'', and appellant claims that this had a tendency to confuse and mislead the jury. The jury by their verdict showed that they were not so misled. The appellant took no proper exception and did not point out to the court the correct name of the corporation. The error was not prejudicial.

The appellant contends that there is no evidence of any greater amount of logs being hauled, under the so-called first cause of action, than 153,192 board feet, that being the amount of logs contained in the three rafts. There is evidence that the truck haulers who transported the logs from the loading platform to the rafts hauled 208,451 board feet of logs. These logs were all pulled to the loading platform by plaintiff's equipment and crew. There is also evidence that there was a considerable number of logs that were logged

to the loading platform but not hauled by the trucks to the rafts. This was evidence to be considered by the jury as to the amount of logs that was actually logged by the equipment of plaintiff.

Finding no prejudicial error, the judgment of the lower court will be affirmed. It is so ordered.

BEAN, C. J., and RAND and BAILEY, JJ., concur.